We now have three cases this morning. The first is N. Re. S.S. Body Armor, Roman I, Inc., Mr. Sesser, Mr. Kornfeld, and it's number 18-2558. Good morning, Your Honors. Good morning. If it pleases the Court, my name is Gary Sesser of Carter, Ledyard, and Milburn, counsel for the appellant, Carter, Ledyard, and Milburn, and I'd like to reserve three minutes for rebuttal. You certainly may. Thank you. This appeal arises out of our firm's representation. Before we begin, maybe you can help me out with a figure, and it's $70 million and $142 million. Can you please explain to me what the difference is here, why we have this discrepancy in the view as to what's at stake? Well, the global settlement is $142 million. The claim of the debtor is that it is only receiving $70 million in proceeds, and the balance is going to victims of Mr. Brooks's fraud. And I think you have to go back to the original settlement from 2015, and the idea of that settlement was there were two criminal restitution awards, $53 million and $39 million, for the debtor and the victims. Those were being combined and divided out by a formula. And apparently, in connection with the $142 million, they just divided it out. But the $70 million figure doesn't include a $20 million payback of a non-recourse loan from the class to the debtor, and it doesn't include $10 million paid to settle the bankruptcy claims of the Brooks family. So essentially, the debtor is getting the benefit of at least $100 million of that amount, and the balance will go to victims. When the criminal restitution awards abated, the compensation that was intended to go to the victims disappeared. And one of the fortunate things is that we had saved the SOX 304 claim, the claim under Section 304 of the Sarbanes-Oxley Act, which is a $186 million strict liability claim, which was an excellent backup, given the fact that the criminal restitution awards abated with Mr. Brooks's death. And ultimately, the SOX 304 claim, which had been stayed for seven or eight years, pending the criminal proceedings against Mr. Brooks, after he died, the stay was lifted. The claims were prosecuted. At the end of 2017, there was a mediation in Florida, ordered by the judge presiding over the SOX 304 claim, and that mediation produced the $142 million global settlement. Well, 142 actually, then you had 26 that went to the Brooks family, is that right? 168, you just switched the 86 around? Yes, I think that's approximately right. There was around $180 million of Brooks's assets that were frozen in the Eastern District of New York in connection with his criminal prosecution. And so that's the fund there. When will the settlement assets, I guess this is what, the third settlement or the fourth settlement all together? Well, it's at least the third. OK, the first settlement was the one in which we made our objection to the indemnification. And essentially, that settlement was a combined class action derivative settlement. The settlement pot was about $48 million, including stock. And the class council was awarded 25% fee of the 48. But in order to create the $48 million pot, they gave away $186 million asset, which was not a great accomplishment and not a great result for the shareholders of the company. So that was the settlement we objected to. And the Second Circuit, of course, found that we were correct, that the indemnification was illegal. And as a result, we saved the $186 million claim for the public company. And in addition, vindicated the public interest. Going back to Judge Sirica's question at the outset. The other settlements. Yeah, the final settlement here of $142 million. Is it $70 or $72 million that goes to the estate? How much goes to the estate of the $142? Ultimately. Well, how much goes to it or how much benefits it? In other words, certain obligations of the estate, clear obligations to the estate. And I listed $30 million, the $20 million loan, and $10 million bankruptcy claim of the Brooks family. So that's being paid. It's not going into the estate and then paying it. It's being paid directly. It's like having somebody pay your bills for you. So the net number is, I assume, $70 million. I've read the same thing. When will those settlement assets be distributed? They may be distributed now. That's the point. In fact, that's the reason we're here today. They could be distributed before the district court rules on the Carter-Ledger Reserve Appeal. Absolutely. That's why we're here. They could go at any minute. I mean, one thing that- You said that in March. I'm so sorry. I'm sorry. I heard you say that, but I'm a little baffled as to how that can be. There are all of these motions that are, or at least it's represented to us, are currently pending before the district court. None of these, the resolution of none of these is dependent, the resolution of none of these would be an impediment to the payout? I don't get it. No. Well, that's the settlement that was agreed in 2015 that when money comes in, that it goes out without further notice or court order. They have the authority to pay out the money. And the one thing the bankruptcy court agreed with us on is that we needed a reserve, and the district court also agreed with that, that absent a reserve, that money would go out as quickly as possible, notwithstanding the appeals that you're talking about. So the exhibit to your adversary's paper is that it sets forth all of the appeals that are currently pending before the district court, which have the potential, at least, for them, if there is finality coming up to the court of appeals, those are essentially, for these purposes, irrelevant. They could be moot, depending, you know, if all of the money is paid out from the settlement before they're ultimately decided. Well, I'm sorry, I'll be more specific in my question.  They're all irrelevant for the question of finality. For the question of finality today? Yes. The question of finality today goes to the reserve appeal. I understand, but all of the things that are currently pending, the argument is there are so many things pending in front of the district court that there's no finality here today, so you should keep in mind that because we don't have a final order, there's no jurisdiction. That's the argument. Yep. So, my question. Well, I think I agree that those are irrelevant to the question. Yeah, that's my question, too. They're irrelevant. To the question here today. Okay. The question today is the reserve appeal, which may be moot by the time it's finally determined. In other words, if it's determined that that is an inadequate reserve, as we contend, and all the money has been paid out, which it can be without further notice or court order, pursuant to the bankruptcy plan that was entered in 2015, then our appeal is moot. It would obviously be impossible to implement an increase in the reserve if there are no funds available. And the bankruptcy court basically conceded as much. The bankruptcy court said, well, look, I could be wrong, and if you're entitled to $10 million and the money happens to be lying around, you'll get paid. And the question is, why should we be dependent, if we made this settlement possible by saving the SOX claim, why should we be dependent on money lying around? We should have an adequate reserve and have a full and fair opportunity to present our case for our fee. Are you able to articulate what percentage of the ultimate settlement is attributable to the SOX claim? I mean, that would seem to be a difficult task, but maybe you've been able to do it. Look, we think that the settlement was motivated by the SOX claim, that the SOX claim drove the settlement, because what happened was two weeks before the mediation in Florida, which produced the global settlement, the district judge in Florida presiding over that case dismissed all of the affirmative defenses of the Brooks estate against the SOX 304 claim. So the Brooks estate was looking down the railroad tracks at a $186 million strict liability claim for which it had no defense. And they did not want a $186 million judgment entered against it. And they then went to mediation. Now, we were not part of the mediation. We were not permitted. I think that was an error on the part of the SEC, frankly. So we weren't in the room. But there's no doubt in our mind that SOX 304 produced this settlement. So because there's no doubt in your mind, that means we should have a multiplier of – there are a lot of numbers out there, 10 million, 40 million, 25 million. Any one of them is a double-digit multiplier. Well, in common fund claims, which this is, the percentages range. You know, they range from, I think, 10% to 34%, et cetera. If you look at the factors that are considered by the courts in assessing fees, we do extremely well on each and every one of them. You know, thousands of people benefit, issue a first impression, contingent fee, and in our case, a double-contingent fee, in the sense that we not only had to win before the Second Circuit, but under the Bankruptcy Court's 2015 order, we had to depend on the SEC prosecuting a claim, which had been stayed for seven years, and at that point in time looked like it would never be pursued. As it happened, as a result of Mr. Brooks' death, it was pursued. And it was settled. But the court mentioned there was a multiplier of 45 to the Lodestar for a $25 million fee. Well, first of all, we never requested a $25 million fee. We requested a reserve in that amount. It was a very preliminary stage, and let me tell you what our thinking was. Our thinking was that we were informed that there was a $132 million settlement. We knew nothing else. We also knew that in 2015, the settlement fund that they were counting on was $92 million. So at that point in time, and looking, for example, what the fees that class counsel were permitted to retain by the Bankruptcy Court in 2015, counsel who lost the appeal that we won, looking at what they were permitted to retain, which was $10 million plus another million and a half for their bankruptcy lawyers, we looked at it and said, well, if it's $132 million and you put a reserve of $25, it leaves $107 million, which is $15 million more than they were counting on in 2015. So there was seemingly no prejudice whatsoever. And it left room for us to ultimately litigate what we were entitled to. I can see where you're coming from. But why don't you address jurisdiction, both under 158A and 1292? Well, under 158A, I think we fall within this Court's Ravel decision, which is that absent a stay pending appeal, it will prevent a full airing of the issues. As I mentioned before, the reserve appeal, which is pending before the District Court now, will be moot. There's no chance for a clawback if the monies were to go out? I mean, not even the Bankruptcy Court or the District Court thought that clawback was a realistic possibility. Debtors at one point in one brief long ago sort of halfheartedly argued the possibility of clawback. But, I mean, you're talking about money going out to thousands of recipients in relatively small amounts. So it's not a practical solution. I want to get back to exactly what the judge was talking about. But on this point, has there been any dissipation of the fund thus far? I would have no way of knowing. I am not in the loop on that. And it's not reported. But what I do know is they've never contested that they have the right to distribute and, as I said, without further notice or court order. One point is significant in that regard. In the Bankruptcy Court order from 2015, it talks about a SOX recovery. And there is a short notice provision in the event of a SOX recovery. But they have taken the position there is no SOX recovery. So I knew that that notice provision was not even going to be applicable. And it was at that point that we moved for the reserve in the Bankruptcy Court. Can you get back to 1292? 1292. So I think this is directly similar to the Seventh Circuit opinion in 48 insulation. That case dealt with the inadequacy of a reserve for claims. The relief is tantamount to denial of an injunction. We're seeking to enjoin distributions from the settlement fund. So we think that there is jurisdiction under 1292A. We note that in Revell, the majority saved for another day. The question of whether there would be jurisdiction under 1292A. The dissenting judge indicated that the 1292, the dissenting judge would have found jurisdiction under 1292. Two judges would have. So two of us would have found that under 158. Yes. Practical matter. And the other would have found jurisdiction under 1292. Yes. So this may be the other day. In fact, if the court doesn't find jurisdiction under 158. So. So it has to be in more than a temporary fashion. You want to protect the substantive relief in more than a temporary fashion. Why do you satisfy that? I mean, I believe we do. We are essentially precluded for all time from obtaining fees in excess of 5 million, which we very well may be entitled to after the issues are litigated. We just don't think at a preliminary stage there should be a severe limit on the fees that we may seek to obtain based on the facts as we know them that are in the public record. So I think that's prejudicial. And I think on the flip side, the Appleys have not shown any prejudice at all other than delay, which is not prejudice. Our finding as to what the corpus was, was either 70 or 72 million. Would your request for a reserve be changed based on that finding? I think I understand your argument to be when you look at the numbers, 186 was out there. 142 was the global. So 25 or more is not unreasonable. My question to you is if we viewed it slightly differently and the number that we looked at was either 70 or 72 million. I understand 72 was for the victims of the fraud and 70 was for the claims of the debtor. Would that justify an adjustment of that $25 million? We're not taking the position that there's a binary choice between 25 million and 5 million. We think 5 million is clearly low. I think that 10 million is low, but we probably would not have appealed if the bankruptcy court had set a $10 million reserve, for example. But as I said, I gave you our thinking at the time when the only information we had was that it was $132 million settlement, which actually turned out to be low. It was $142 million. But in the context of a normal fee application in a district court, certainly an objector would get the benefit of having provided compensation for victims of fraud and creditors and the debtor. So it seems that that shouldn't be excluded from consideration just because our fee wound up before the bankruptcy court for reasons certainly beyond our control. Going back to the merits for the moment, the courts typically have a choice between percentage of recovery and Lodestar. Percentage of recovery, a lot of courts go there first. But it looks like Judge Shanchi was thinking about Lodestar, and the reason I back into that is he said with regard to your likelihood of success on the merits, the risk of irreparable harm to Carter Ledger was, quote, balanced out, close quote, by the firm's extremely low, if not nonexistent, likelihood of success on the merits. I mean, I just disagree with that. I'm just saying, I mean, essentially anything he were to do on this would be an abuse of discretion. And it sounds like he's not thinking about the percentage of recovery, which I agree in a lot of common fund cases is right around 10 percent, you often see. It doesn't mean you have to go there. But it looks to me like he's looking at Lodestar, that you had 500 and some thousand dollars in the case in connection with the Second Circuit. And he's saying nine times that will give you the reserve. And so be it. Now, I realize in chasing all this money you've spent, what, about another $2 million? We're at $3.5 million, including out-of-pocket disbursements, as I stand here today. And I haven't practiced in this area in quite a while. But what's the law on whether you can include within the monies that you seek the amount that you spend in chasing the money? I mean, I think the general rule is that you can't. But what we're suggesting is that in determining whether Lodestar is the appropriate measure in this case, you would have to take into account the extraordinary circumstances of the case, which are, it's been nine years since we won the appeal in the Second Circuit. And for reasons beyond our control, we've been slugging our way through the bankruptcy court and other courts just to get the opportunity to present a fee claim. And so the decisions of this court suggest that the factors that go into a fee are not to be applied formulaically. But in certain cases, some factors are way more important than others. And I would suggest that in this case, the Lodestar is the least appropriate. Because we're essentially being punished for the bankruptcy. And the reality is that if the district judge in the Eastern District had recognized the merit of our objection in 2007, and Mr. Brooks had been compelled to reimburse DHB 186 million, there would have been no bankruptcy. So to punish us for essentially punish us for having nine years of litigation through bankruptcy in order to be able to present our fee claim seems to me inequitable, particularly when the preferred alternative is the percentage method, which rewards success. You opened the gate, obviously. But it looks like the SEC did a lot of heavy lifting in the Florida litigation on SOX 304. Well, we don't have standing. In fact, no private party has standing to pursue a SOX 304 claim. That was one of the issues that was decided by the Second Circuit in our appeal and one of the points we argued against the indemnification. So that's true. And I'm fully prepared to share credit with the SEC. They did a splendid job. But I think it should be noted that it is a strict liability claim and that all of the elements of the claim were either undisputed or admitted. So, you know, they did excellent work, but it was a strict liability claim. In the common fund cases that you're alluding to, where there's usually a percentage, I think you've mentioned, are the counsel in the cases that you have in mind counsel that have been counsel of record from the beginning of litigation? Yeah. Because obviously this is an unusual. Yes. Posture, right? You come in like, you know, it's your high noon moment. Right. So I think they are. I think most of those cases are counsel of record cases. You know, lead counsel in a class action and things of that sort. The difficulty we have is there are no objector cases where anything like this has been accomplished. I mean, you can't find an objector case where somebody has saved one hundred eighty six million dollar claim. Objectors are awarded fees for improving the settlement. If we hadn't improved the settlement, the Second Circuit would have affirmed in 2010. So clearly. But but objectors are granted fees for approved, you know, improving class action notices and relatively small things. Once in a while they'll discover a claim and get a percentage of that. And there are some cases in that area. But nothing like this. Nothing where an objector has basically saved a hundred. The real objective was Mr. Cohen back in 2010. Was it what the real objective was? Mr. Cohen, was it not? Yes. Absolutely. If he had not if he had not decided to appeal in 2008 and he was the only one to prosecute an appeal and we were his counsel. We would not be in this position today. They would not be sitting with one hundred and forty two million dollars settlement today. I'm not saying that down years down the road, something might not have come out of a civil asset forfeiture. But by their own stipulation, that case that they're saying was the driver of the settlement required years of additional litigation. Was fact specific, would have involved almost a retrial of the Brooks criminal proceeding, which was extensive, went on for months. It was at the pleading stage, whereas the Sox 304 claim was at the summary judgment stage. The final question I have is what was the effect of the Sox 304 claim on the overall settlement? Because I thought that the Sox 304 claim was just one of several chips that were on the table. It's a global settlement. Unquestionably, a variety of different claims were were were resolved. And so there is a you know, there is an element of judgment and in terms of the role of the Sox claim. But I mean, I think it's obvious when you look at the facts and look at the fact that the case settled in a mediation in the SEC proceeding. Two weeks after all of the affirmative defenses of the Brooks estate had been stricken by the district judge on motion of the SEC. I think it's pretty clear they didn't want one hundred and eighty six million dollar judgment entered against the estate that that drove the settlement. And am I correct that the settlement of the SEC action says that the estate will reimburse the debtor one hundred and forty two million dollars pursuant to the 304 Sox? Yes, absolutely. It says that the judgment entered in the SEC action in December has those words. Yes. Thank you. We'll get your back. Mr. Cornfield. Good morning, your honors. May it please the court. Alan Cornfield, Chelsea Stang, Zill and Jones on behalf of the post confirmation debtor and the Recovery Trust. Your honors, let me first turn to the first question the panel asked of my adversary, which is how much is the settlement? Is it 142 or 70? Last Wednesday, the post confirmation debtor received a wire from the United States Marshals Service in the amount of 70 billion, six hundred twenty five thousand and fifty seven dollars. So as we've said all along, what we were going to get and what we in fact got in connection with the settlement was approximately a little bit over 70 billion dollars. It's not one hundred forty two billion dollars, although the settlement settles one hundred forty twenty six million. Ultimately in this settlement went to the Brooks family. Exactly. There was one hundred sixty eight billion of restrained assets. The deal was in the two thousand seventeen and two thousand eighteen settlement. The family who had eighty five million dollars of claims to the restrained assets would get twenty five million dollars. And in exchange for that twenty five million dollars, everybody who had claims against the family, including bankruptcy estate, who had derivative claims, the class who had class action claims, the United States of America who had civil forfeiture claims which had not been abated. The SEC, which had sought fear for and other claims, everybody would give the Brooks family a release. The problem we faced in the settlement was the family who had claims to eighty five billion of restrained assets. As the Eastern District of New York found, if we had not settled with the family, we would be in litigation with the family. Today, instead of in this court fighting about who gets the restrained assets. The settlement settled that fight. That was the importance of the settlement. The SOX 304 action was part of the settlement because the Brooks family, who was not named in the SOX 304 action, only David Brooks, who died in prison, was named and his brother was substituted in his place as his personal representative. But the family was not a party to the SOX 304. The SOX 304 judgment would not have been binding on the family. All the assets had been restrained. If there was a SOX 304 judgment without a settlement, the question would have been, how does that judgment get collected? We're bankruptcy attorneys. We're bankruptcy fiduciaries. We have to bring in money and pay it out to allowed claim holders and allowed equity interest holders. But you would not have had the kind of payday that we're talking about now if it hadn't been for Mr. Cohen and Carter Ledger. I don't I don't think that's true, Your Honor. So if they had not that they had done nothing in 2010, you're telling me you would have right now the kind of settlement you're talking about? Well, first of all, they had done nothing in 2010. The SEC could have, if it wanted, continued with its SOX 304 action. The SEC was not a party to the class action in the Eastern District of New York where the settlement was reached. We as bankruptcy attorneys, when we filed the case on April 14th, 2010, we immediately moved to reject that settlement. There had been the decision of the Second Circuit did not come down until September. That settlement did not bring a penny into the state, just like our derivative action. But it turned down a settlement that would have been the settlement was for a SOX claim, right? The settlement was for indemnification of Brooks in connection with the SOX claim. The SEC could have continued with that SOX litigation and taken the position that what happened in the Eastern District of New York in no way bound SEC. And what we would have done if we had to litigate and Mr. Cohen had not done what he would have done, we had a derivative action pending upon the filing of bankruptcy estate. The derivative action, which mirrored. What was the criminal indictment against Brooks? It was to recover the insider trading proceeds. It was to recover the monies that Brooks had looted from the company, which we felt we could prove up to $117 million in damages against Brooks. We would have litigated that derivative action, but we would have faced the same problem that everybody faced, which is how do you get at Brooks's assets other than what the FBI had restrained? So when I look at ultimately what came in, the final settlement looks like $142 million is forfeited to the government in the EDNY civil forfeiture action. And then the government then distributes $142 million in two parts, roughly $70 million, you say $70.6 million to the debtor, and the balance, which is $72 million, to other victims. So it sounds like that would, those would be people that would have claims in the bankruptcy, would they not? Those other people are the class. So the class did have claims against the bankruptcy. So Judge Sirica is right that roughly it's the Sox claim coming into the debtor, or for the benefit of the debtor, I should say, is $142 million. The amount, you can look at it that way, or you can say what the debtor has in cash that the debtor can distribute is $70 million. The class and the debtor reached a settlement back in 2015, which was part and parcel of confirming a plan. The settlement with the class was that the debtor and the class would stop fighting with each other. And because we had sued the class, the class had large claims. The concept was victims of Brooks's misconduct would stop fighting and would, in a unified front, go forward and maximize each of their recoveries. The settlement is $70 billion to the class who had claims to the bankruptcy estate and $70 billion to the debtor to distribute to the debtor's predators and other equity holders who are not members of the class. Now, in cases like this, it seems that most courts tend to try to do a percentage of the recovery. Is that what you're finding as well? Not in a case like this, Your Honor. Cases don't do a percentage of recovery where the calculation is such that a percentage can't be calculated in any way. And that's this case. Where there's a percentage of recovery is when usually it's counsel to the class creates a fund and a fund with cash, not a fund with a claim. It's a fund with cash. And then counsel will argue that they created a fund. There is cash sitting there.  In this case, by contrast, and we cite the cases like the Winston and Strong case, where there's a counsel who makes a contribution, like CLM made a contribution. The question is, how do you calculate what the percentage is if you were going to apply that? And you can't calculate the percentage because what they did is preserve a claim. They didn't create a fund. They didn't liquidate the claim. In bankruptcy, we follow the cash. If there is no cash, there is no fund from which a percentage can be calculated. So if this had been a class action instead of a derivative claim, we would have used a percentage of the fund. If, in fact, the objector was instrumental in getting the judgment reversed and augmenting the estate. Exactly.  Or if the objector had augmented the recovery. So, for example, if the recovery in the class was approximately, based on the numbers that we're familiar with, approximately $37 million. If Mr. Cohen, as the objector, had objected and augmented by the objection, the settlement fund, then a percentage of recovery for the augmented amount would be appropriate. That's not what happened here. What happened here was there was preservation of a claim. There wasn't creation or augmentation of the fund. That's why percentage of recovery is not appropriate. No way to calculate the benefit that was conferred here. Let's talk about, for a moment, what happened here in this bankruptcy case. Didn't the bankruptcy and the district courts, didn't they see it as they were going to do a percentage and not a lodestar? I think they saw this case as a lodestar case, but it looked to me, and maybe I can find the quotes, but it looked to me like they were initially looking at it as a percentage of recovery. I was in front of Judge Sanche and argued that, and then Judge Sleet did not hold oral argument. But my impression of where Judge Sanche was looking, and I think the transcript reflects this, he was looking at this as a lodestar case with a possible multiplier. And certainly Judge Sleet, when he looked at this, looked at the case as a lodestar case with a multiplier and did what he called a check of what the hourly rate was. The lodestar crosscheck. And he got up to hourly rates of approximately $16,000. But a lodestar crosscheck is just a crosscheck on percentage of recovery. Indeed, it is. Because I'm looking at Judge Sirica's opinion in Prudential. A percentage recovery approach is generally favored in cases involving a common fund. And obviously Winston Strawn from the District of Columbia District Court says the same thing. And I'm trying to find the quotes in here that it appeared. You know, the bankruptcy court is saying, you know, percentage calculations are totally, quote, back of the envelope. And it looks like he chose a loose version, if you will, of the percentage of recovery method. We never had an argument on a fee application, Your Honor. That's why our position would be there's no finality here. But the question is, let's assume that they're doing, that I'm correct, or the court was thinking out loud and maybe doing a loose version of the percentage of recovery. If you look at the factors that we normally consider, the Gunter factors, skill and efficiency, complexity, number of persons benefited, the amount of time devoted, the risk of nonpayment, the size of the fund, the awards in similar cases, the first five factors. It looks like Carter Ledger showed great skill in the Second Circuit. I don't think anybody can deny that. The court even complimented the firm on its terrific work. Secondly, the case was quite complex. The question of SOX 304 was an issue of first impression in the Second Circuit. And that's what the court says on page 193 of its opinion. Carter Ledger's efforts in the Second Circuit will benefit thousands of creditors and equity holders by growing the settlement pie, and that's been proven. Carter Ledger spent approximately at that point $500,000 plus of its own money and has since spent $2 million in trying to collect. And then its risk of nonpayment was real. Aside from the advance of $139,000 from Cohen, the firm essentially took the case on contingency. And so there's five of the seven factors that line up in favor of Carter Ledger. The key factor that isn't there is that they didn't create a fund. The fund was created through the restrained assets. The restrained assets were then subject to the Mandatory Victim Restitution Act. We filed petition after petition with the Department of Justice, and ultimately the restrained funds were used to fund the petition for remission. So all of the money came out of funds that the United States had restrained in the Eastern District of New York. Carter Ledger... But at the very least, the fund right now is $70.6 million, at the very least. At the very least, the fund is $70.6 million. That is absolutely correct. Let me ask you this question. I believe this is... Do you recognize this chart? I sound like I'm McCarthy at the hearings. Do you recognize this? I do, Your Honor. Good. I never call you Joe McCarthy. I appreciate that. I just wanted to reference you so you have it in front of you. I do, Your Honor. So when I spoke to your adversary about that chart, my question to him at the time was, your adversary has put before us all of these different orders, motions, etc., that are currently pending before the district court, some of them in front of the bank, I think one or two in front of the bankruptcy court. So when I was speaking to him, I said, what does that say with regard to finality? Now, his view, I think you heard, was essentially they're irrelevant for the consideration and that for 158 purposes as well as for 1292 purposes, we can move forward. So 158 first, if you will, as it relates to your chart, that would be helpful. I think they're highly relevant to finality and for an ultimate decision on 1292, taking 158. Your Honor, if you look at the bottom of the chart, the second rectangle on the bottom is the 12-3-15 bankruptcy court order on CLM's $1.86 billion fee application. That was the fee application issue that was adjudicated in the bankruptcy court, whereby the bankruptcy court said CLM is entitled to a fee. The fee will be payable solely from a SOX 304 recovery. That's the key issue. That issue is not decided by anything this panel would determine today because that issue is pending in the district court, been fully briefed and has not yet been decided. That's the issue where the courts will get to exactly the last series of questions that I was asked. Does Carter Ledger deserve a fee? How much should that fee be? Those are the key issues. What happens today does not determine that. It determines the reserve. It determines the reserve, which is more than adequate. Two courts have already found that. We've argued extensively in our papers. Thank you, Your Honor. I'm not sure we're done. Then I'm not sure I'm done. I keep looking back at what the bankruptcy court did. It looks like it says, well, Carter Ledger's fee eventually could be 1% of the SOX 304 claim or it could be higher. First, it was not deciding what the appropriate percentage is. Then at the reserve hearing in 2018, the court struggled to adjust percentages based on comparable cases and considered the eventual award in terms of percentage while accounting for traditional percentage of recovery awards like attorney's fees that have been incurred, etc. It looked like the district court didn't do anything further. So I keep coming back. It looks like the court is thinking, I'm going to do percentage of recovery. And if you 5 million is what, 3 point? What percentage? 5 million of 70 billion is 7%. Okay. And so that's a little bit less than what is sometimes given. If you look at the rules of the road, oftentimes seem to be right around 10% and it can go up as high as 30%, etc., etc. Right. And then what we would argue extensively below is you've heard sort of our preview. You've heard CLM's preview. Everybody would argue to the bankruptcy judge what was the appropriate methodology and what was the appropriate number. And that's why we don't have fidelity here today under either 158 or 1292. Well, in effect, for the setting of the reserve, it is denial of basically the way the Seventh Circuit looked at it in 48 installations. It's in effect a denial of an injunction. If this court was to adopt the Seventh Circuit definition of an injunction, which I don't believe it has, if you look at TWA, this case is more like TWA than it is like 48 installations, that was a stay order and the court said that's not an injunction. So it depends on... Well, didn't it say the denial of a stay is in effect we're going to find that we have jurisdiction under 1292A? That's indeed what the court found, but not in TWA. In TWA, which was a denial of a stay in this court in the 80s, the court said no jurisdiction under 158 or 1292. All right. Thank you. Thank you, Your Honors. Just a couple of additional points. TWA was the grant of a stay, not the denial of a stay. I think that was the key distinction in that case. I also heard something from DeVos Council concerning what the SEC could do or would have done regardless of actions that we take. So I think it's well to look at what the SEC said in their amicus brief in the Second Circuit, which was that if the indemnification was allowed to stand, it would be pointless to pursue the SOX 304 claim. And the Second Circuit picked up on that in its opinion and basically said it nullifies the SOX 304 remedy. So but for our appeal, our successful appeal, the SOX 304 claim would not be pursued. Also, it is correct that the bankruptcy judge in 2015 was looking at percentages and said the percentage that might be awarded in the future was completely reserved. On the question of the Lodestar, you know, I think it's being applied selectively. Debtor's Council in 2015 supported a $1.5 million fee for Bankruptcy Council for the class without any documentation whatsoever, without an invoice, a description of services, billable hour. So no Lodestar analysis was done for that. And I think that it's interesting that in 2015, debtors claimed that we were entitled to no fee because we hadn't created a common fund. In 2015, before the SOX claim was pursued, a Lodestar might have been appropriate. In this case, there clearly is a common fund. There's $142 million. And I should mention that there was a letter that was sent by class council to the Eastern District of New York this past November, November 9, 2018, bragging about the outstanding recovery for the class. Originally, they expected $34.9 million for the class. And now, as a result of this settlement, it's tens of millions of dollars more. Where did that money come from? It came from the SOX claim, the very claim that they fought to give away, that they opposed us in the Second Circuit when we tried to eliminate the indemnification. Class council lost that appeal. Now they're bragging about what a great result they got to the Eastern District, no doubt looking for additional fees. Do we have to decide the percentage versus Lodestar? Not necessarily. I think what you have to decide is should we have a full and fair opportunity to present our fee application without an artificially low cap on the number. That is the issue today before the court. The question as I see it is, is the setting of the reserve at $5 million by the bankruptcy court an abuse of discretion? Well, I think that the overall question, that goes to likelihood of success under the factors in Revell. And my reading of the Revell decision, and I don't think this was disputed, that on the likelihood of success, that's looked at de novo by the, should have been looked at de novo by the district court instead of on an abuse of discretion standard. And if you look at it de novo and what the cases say about percentages and what the factors that the courts consider in fee applications, you would see that we have a way better than negligible chance of getting an award of more than $5 million. You know, likelihood of success is actually, as you know, doesn't mean more than 50-50 under the cases. You don't have to show a probability. If you have a way better chance of getting more than $5 million, I mean, why did Judge Chauncey make the comment he made that the risk of irreparable harm to Carter-Ledger was balanced out by the firm's, quote, extremely low, if not nonexistent likelihood of success on the merits? I mean, that seems to be telegraphing what the court is thinking you're going to ultimately get. And it ain't going to be more than $5 million. That's true. That certainly, but I think that with guidance from this court on the appropriate measure in a fee case such as this, he may change his mind or we may ultimately have to appeal from what Judge Chauncey rules. But I do not think in the circumstances of this case that Lodestar is the appropriate measure of our contribution. But just talking into the world of possibilities, right? So your the reserve, you say too low, got that. The application hasn't been ruled on per se, right? Your fee application hasn't been ruled on. No, that's correct. So your fee application at some point in futuro will be ruled on. And the reserve doesn't preclude a finding that your fee exceeds the $5 million. I understand the practical reasons why you want a higher reserve. But the reserve doesn't preclude a finding of a higher fee. Judge Chauncey said he could award more. He could award $10 million, and quote, unquote, and if the money is lying around, happens to be lying around, you'll get paid. That's pretty much the exact quote from Judge Chauncey. And my question is, if we made this settlement possible by saving $186 million claim and acting in the public interest, why should we be dependent on money lying around, the unlikely event that money will be lying around in bankruptcy in order to get the fee that it's determined that we deserve? I think a reserve should accommodate what a possible fee is. They've shown no prejudice by a larger reserve. I mean, I think that point should not be overlooked. That there's been no, in terms of the balance of the harms, there is prejudice to us and none to them. Is the bankruptcy judge delaying? I mean, obviously, this matter is pending on appeal on the reserve. But is there any reason why he wouldn't give a fast hearing? This is our problem. We do not think that the order in 2015, which made our entitlement to a fee as an objector, completely dependent on a recovery under SOX 304, was a correct decision. We improved the settlement. We were entitled to a fee. If we go and litigate the fee application now, we run the very real risk that he'll say, well, look, I think I agree with the debtor. This had nothing to do with SOX. It came from a civil asset forfeiture or whatever else, disgorgement. And we will wind up with zero, which is not a good result. Not an appropriate result under the circumstances. And we will be held to have waived, by not pursuing the pending appeal in the district court on that topic, we will be held to have waived our objection to the 2015 order. So we need to get guidance from the appellate court that we're entitled to a fee. Yes, it certainly should take into account the enormous recovery we've now had attributable to the SOX claim. But we're entitled to a fee regardless. Derivative counsel was paid a fee. The only thing they did was negotiate the illegal indemnification. The debtor supported a fee for derivative counsel who lost the appeal that we won. And yet we could wind up with zero. I get the impression that for you this has become a matter of principle. Yes. I think this pretty much concludes our argument, unless anyone else has any questions. But I would ask two things. One, if you could have a transcript prepared of this oral argument, split the cost evenly. Just check with the clerk's office. And I would ask Mr. Kornfeld and Mr. Sasser if you would come up here. Yes. And Keith, if you'll turn it off.